IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2014 Term

_____

No. 11-0728

_____

**FILED**

**November 25, 2014**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

JOHN C. SCOTCHEL, JR.,
Respondent

_____

Lawyer Disciplinary Proceeding
No. 11-0728

LAW LICENSE ANNULLED AND OTHER SANCTIONS
_____

Submitted: September 9, 2014
Filed: November 25, 2014

Jessica H. Donahue Rhodes, Esq.
Office of Disciplinary Counsel
Charleston, West Virginia
Counsel for the Lawyer Disciplinary Board

J. Michael Benninger, Esq.
Benninger Law, PLLC
Morgantown, West Virginia
Counsel for the Respondent

JUSTICE BENJAMIN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure, effective July 1, 1994, requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence. Prior cases which required that ethics charges be proved by full, preponderating and clear evidence are hereby clarified." Syl. Pt. 1, *Lawyer Disciplinary Board v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995).

2. "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984).

3. "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any

aggravating or mitigating factors.'" Syl. Pt. 4, *Office of Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998).

4. "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. Pt. 4, *Lawyer Disciplinary Board v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003).

5. "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. Pt. 2, *Lawyer Disciplinary Board v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003).

6. "Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13)

remoteness of prior offenses." Syl. Pt. 3, *Lawyer Disciplinary Board v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003).

7.     "The Disciplinary Rules of the Code of Professional Responsibility state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." Syl. Pt. 3, *Committee on Legal Ethics v. Tatterson*, 173 W.Va. 613, 319 S.E.2d 381 (1984).

8.     "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syl. Pt. 3, *Committee on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987).

9.     "Although Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates the factors to be considered in imposing sanctions after a finding of lawyer misconduct, a decision on discipline is in all cases ultimately one for the West Virginia Supreme Court of Appeals. This Court, like most courts, proceeds from the general rule that, absent compelling extenuating circumstances, misappropriation or conversion by a lawyer of funds entrusted to his/her care warrants disbarment." Syl. Pt. 5, *Office of Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998).

10. "Disbarment of an attorney to practice law is not used solely to punish the attorney but is for the protection of the public and the profession." Syl. Pt. 2, *In re Daniel*, 153 W.Va. 839, 173 S.E.2d 153 (1970).

Benjamin, Justice:

In this disciplinary proceeding we review a recommended disposition by the Lawyer Disciplinary Board (hereinafter "the Board"), in which the Board has recommended, among other sanctions, that lawyer John C. Scotchel, Jr., have his license to practice law annulled. The Board asserts that Mr. Scotchel violated Rules 1.5(a), 1.5(b), 1.5(c), 1.15(b), 8.1(b), 8.4(c) and 8.4(d) of the Rules of Professional Conduct. After careful consideration of the record, briefs and legal precedent, we find clear and convincing evidence to support the findings of the Hearing Panel Subcommittee (hereinafter "HPS") that Mr. Scotchel violated the above-referenced Rules of Professional Conduct and uphold its recommendations that Mr. Scotchel's law license be annulled and that Mr. Scotchel be held responsible for the costs associated with the instant disciplinary proceeding. However, we find the HPS's remaining recommended sanctions regarding reinstatement are premature.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Mr. Scotchel was admitted to the West Virginia State Bar on May 15, 1984. He has been engaged in the private practice of law in the Morgantown area since that time. For most of his career, Mr. Scotchel has been a solo practitioner. His practice involves general to complex civil litigation wherein Mr. Scotchel usually serves as plaintiff's counsel. Mr. Scotchel has had no prior disciplinary record.

1

In the instant disciplinary proceeding, the HPS concluded that Mr. Scotchel charged excessively high attorney's fees despite performing little if any substantive work on a variety of legal matters involving the complainant, Mr. Lewis Snow, Sr., including: the sale of Mr. Snow's sanitation business, certain misdemeanor charges, a workers' compensation coverage issue, and claims before the Public Service Commission. The HPS also concluded that Mr. Scotchel improperly retained proceeds from the sale of Mr. Snow's sanitation business in supposed payment for such unreasonable unpaid attorney's fees and that he failed to provide a requested full accounting of the money to Mr. Snow from the sale of the business. Furthermore, despite being instructed during the course of the disciplinary proceedings below to re-create the time demonstrating his work and fees on his claimed representation for Mr. Snow, Mr. Scotchel failed to provide a detailed accounting to support his claimed fees. A brief history of the work performed by Mr. Scotchel on these various matters follows below.[1]

### The Sale of Mr. Snow's sanitation business

Between October 2002 and January 2003, Mr. Scotchel began work for Mr. Snow relating to the sale of Mr. Snow's sanitation business. Mr. Snow agreed to pay Mr.

---

[1] In response to the April 6, 2009, complaint filed by Mr. Snow with the Office of Disciplinary Counsel, Mr. Scotchel filed a verified response on May 29, 2009, in which he asserted that he performed legal work on a variety of matters for Mr. Snow from October 2002 to June 2008. He claimed that the work was done for a total "flat" fee of $242,500, which he reduced to $171,500. He later rounded this amount down to $170,000. Mr. Snow denied agreeing to pay Mr. Scotchel anything more than $25,000.

2

Scotchel a fee of $25,000 contingent on the sale of the sanitation business. If the sanitation business was not sold, then no money would be paid. There is no 2002 written contract regarding this agreement. Mr. Snow's business was not sold at this time.

Subsequently, between October 2005, and October 2006, Mr. Scotchel again began preparation of a comprehensive package to sell the business utilizing Mr. Snow's income tax returns, receipts, territory, customers, and value of equipment. Mr. Scotchel asserted in his verified response that his fee for work performed on the sale of Mr. Snow's sanitation business from October 2005 to October 2006 was a total fee of $25,000, of which he charged Mr. Snow $25,000. Mr. Scotchel also alleges that during this same time frame, he performed "extensive reviewing, discussing and explaining potential multiple violations regarding Internal Revenue Service and West Virginia State Tax Department for a number of years;" however, the record contains no precise indication as to what these supposed violations may have been nor is there any specification as to what exact representation or investigation was performed by Mr. Scotchel. In his testimony, Mr. Scotchel was vague about the details of the supposed "violations" and the specific work he allegedly performed on behalf of Mr. Snow. He claimed that he had multiple conversations with Mr. Snow on this subject. For this

3

purported representation regarding Mr. Snow's supposed federal and state tax violations, Mr. Scotchel charged Mr. Snow a flat fee of $25,000.[2]

A year later, on November 6, 2007, Roger L. Cutright, acting as counsel for a potential purchaser of Mr. Snow's business, sent Mr. Scotchel a letter stating he had been advised by his client that Mr. Scotchel represented Mr. Snow in selling his business. Mr. Cutright asked for Mr. Scotchel to forward to Mr. Snow his client's proposed terms and conditions of the sale. On November 8, 2007, Mr. Scotchel sent Mr. Cutright a response stating the price to purchase the business was $300,000. Thereafter, Mr. Cutright prepared documents to effect the sale of the sanitation business. On December 10, 2007, Mr. Cutright sent Mr. Scotchel a letter stating "enclosed please find the purchase agreement to acquire public service commission certificate with respect to Lewis Snow, Sr., dba Snow's Sanitation Service, for your client's review and execution."

On or about February 19, 2008, Mr. Scotchel received a letter from Mr. Cutright that stated: "[E]nclosed please find two (2) duplicate original execution versions of the Purchase Agreement to acquire Mr. Snow's Public Service Commission Certificate. Please have Mr. Snow execute and acknowledge the Purchase Agreement and

---

[2] Mr. Scotchel's verified response to the ethics complaint reflects that for the work performed in 2005 and 2006 regarding the sale and transfer of the business and review and discussion with Mr. Snow of various civil and criminal tax liability issues, he actually charged a total fee of $50,000.

Form 11 in front of a notary and return both originals to my office." On February 21, 2008, Mr. Scotchel returned to Mr. Cutright the two original purchase agreements properly executed by Mr. Snow to permit transfer of Mr. Snow's Public Service Commission Certificate. On March 5, 2008, Mr. Cutright sent an original version of the Purchase Agreement to the Public Service Commission. By June 12, 2008, the Public Service Commission Certificate had been transferred and the sale of Mr. Snow's sanitation service had been finalized.

Regarding the transactional work performed on the sale of the sanitation service, Mr. Cutright testified at the Board hearing that he performed the vast majority of the work in reference to the sale and closing of Mr. Snow's business to Mr. Cutright's client. For all of the work he performed on behalf of the purchaser of Snow Sanitation, Mr. Cutright testified that he charged $2,398.25. As for the work performed on the transaction by Mr. Scotchel, Mr. Cutright testified that Mr. Scotchel simply reviewed Mr. Cutright's documentation. Mr. Cutright further testified that the sale price dropped from $300,000 to $275,000 during the course of the negotiations because of charges filed against Mr. Snow and because of delay in the sale of the company by Mr. Scotchel. The amount of $275,000, representing the proceeds of the sale of Mr. Snow's sanitation business was deposited into Mr. Scotchel's IOLTA checking account. Mr. Scotchel claims that Mr. Snow agreed to pay him a "flat" fee of $25,000 for work done on the sale of his sanitation company from November 2007 to June 2008.

## *Misdemeanor Charges filed against Mr. Snow*

Mr. Snow was charged with a total of four misdemeanors in Monongalia County – all related to the operation of his business. The first two of these charges were filed together on January 28, 2003: Operating a Solid Waste Facility without a Permit, Case No. 03-M-225, and Operating an Open Dump, Case No. 03-M-226. The third charge was filed on January 31, 2003: Having an Illegal Salvage Yard, Case No. 03-M-318. The fourth charge was filed on November 9, 2006: Failure to Provide Certain Records in Monongalia County, West Virginia, Case No. 06-M-3447. In his response to Mr. Snow's complaint to the Office of Disciplinary Counsel, Mr. Scotchel later asserted that his total fee for representing Mr. Snow in all four cases was a flat fee of $80,000, which he reduced to $50,000. The work which Mr. Scotchel performed on these four misdemeanor representations is set forth below.

### 1. *Misdemeanor Charges Nos. 03-M-225 and 03-M-226*

On January 28, 2003, Mr. Snow was charged with two different criminal misdemeanor charges in Monongalia County, West Virginia: Operating a Solid Waste Facility without a Permit and Operating an Open Dump. Mr. Snow was initially represented by Eugene J. Sellaro on these two charges. The record reflects that from March 2003 to June 2003, Mr. Sellaro filed several motions, requests for discovery, and related pretrial material on behalf of Mr. Snow in case numbers 03-M-225 and 03-M-226. On June 30, 2003, Mr. Sellaro filed a Motion to Continue, Motion to Withdraw, and Order of Continuance/Withdraw in case numbers 03-M-225 and 03-M-226, because he

6

was closing his legal office. An order authorizing Mr. Sellaro's withdrawal and continuing the prosecution of both of these criminal cases was entered on July 2, 2003.

Subsequently, on September 30, 2003, Mr. Scotchel first appeared in representation of Mr. Snow and filed a Motion to Withdraw Request for a Jury Trial and Notice of a Plea in case numbers 03-M-225 and 03-M-226. Such was granted on October 1, 2003. On December 1, 2003, Mr. Snow pled guilty to Operating a Solid Waste Facility without a permit as charged in case number 03-M-225. Case number 03-M-226, relating to the Operation of an Open Dump, was dismissed. Mr. Snow was sentenced to a $500 fine plus court costs and a suspended fifteen days in jail. The record reflects no other work by Mr. Scotchel on these two charges.

## 2. *Misdemeanor Charge No. 03-M-318*

Three days after being charged with the above-referenced misdemeanors, Mr. Snow was charged on January 31, 2003 with an additional, but separate, misdemeanor charge in the Magistrate Court of Monongalia County, West Virginia: Having an Illegal Salvage Yard, Case No. 03-M-318. On February 7, 2003, Mr. Snow listed Mr. Sellaro as his attorney. This charge was dismissed following a bench trial on April 22, 2003, in which Mr. Snow was represented by Mr. Sellaro. The record reflects no work by Mr. Scotchel on this charge. Furthermore, Mr. Sellaro testified that did not remember ever speaking to Mr. Scotchel about this or any other cases.

### 3. *Misdemeanor Charge No. 06-M-3447*

On November 9, 2006, Mr. Snow was charged in Monongalia County, West Virginia, with a fourth misdemeanor offense: Failure to Provide Certain Records, Case No. 06-M-3447. On December 11, 2006, Mr. Snow signed his "Initial Appearance: Rights Statements" in 06-M-3447 wherein he expressly gave up his right to an attorney. On May 8, 2007, a no contest plea was entered by Mr. Snow for which he received a $100 fine and no jail time. Mr. Scotchel is listed as counsel for Mr. Snow in the Plea Agreement in that case. The record reflects no other work by Mr. Scotchel on this charge. The Assistant Prosecutors who represented the State testified that they were not seeking jail time for Mr. Snow and both stated that they spent very little time on the case.

### *Matters Involving the Public Service Commission*

#### 1. *Case No. 04-2003-MC-19A*

On December 22, 2004, Mr. Snow filed an application through the West Virginia Public Service Commission ("PSC") to increase rates and charges for Snow's Sanitation Service, case number 04-2003-MC-19A. The case was transferred to the Division of Administrative Law Judges and Mr. Snow was ordered to make several mailings by March 14, 2005, with proof of mailings to be provided by March 28, 2005. Mr. Snow himself timely performed such mailings and provided proof. Staff was required to file a report by April 11, 2005, and a decision in the case was required to be made by August 19, 2005.

8

On April 8, 2005, staff filed the audit report which recommended a 28.7% rate increase. On April 15, 2005, an Order was entered that required Mr. Snow to provide notice to customers of the recommended increased rates and to file the required form by May 12, 2005. On May 12, 2005, Mr. Snow filed a copy of his published notice. The following day, the Monongalia County Solid Waste Authority filed a letter of protest to the rate increase due to Mr. Snow's various alleged violations of the PSC's rules over the years and the significant number of complaints about the service of Mr. Snow's business. Thereafter, Mr. Snow filed his affidavit of publication and the completed form with the PSC on or about June 3, 2005.

On June 27, 2005, Mr. Scotchel filed a Conditional Notice of Appearance, as well as a Motion to Continue the July 6, 2005, hearing and a motion to extend the decision date in case number 04-2003-MC-19A. In his Conditional Notice of Appearance, Mr. Scotchel stated that the "notice is conditional because of the conflict and lack of time to prepare for the hearing scheduled for July 6, 2005 at 10:00 a.m." Mr. Scotchel's Motion to Request to Extend the Due Date stated,

> Just so the record is clear, if this Motion to Extend the Due Date for Issuance of Recommended Decision is denied or applicant's second Motion for Continuance is denied, the undersigned attorney withdraws his Notice of Appearance and by copy of this Motion to the Applicant, advises applicant to seek representation from another attorney.

By order dated June 28, 2005, the decision due date was extended until December 19, 2005. By order dated June 30, 2005, the July 6, 2005, hearing was

9

cancelled and a new hearing date was set for August 9, 2005. Four weeks later, on July 28, 2005, Mr. Scotchel again sought a hearing continuance, filing a Motion to Continue the August 9, 2005, hearing. Deputy Director Thornton Cooper did not object to the continuance and it was rescheduled for October 4, 2005.

On September 23, 2005, the Authority filed a Motion to Continue the October 4, 2005, hearing date and a Motion to Request Extension of Due Date for the Issuance of the Recommended Decision set for December 19, 2005. In support of its motions, four days later, on September 27, 2005, Deputy Director Cooper filed a letter stating that Mr. Scotchel had informed him that Mr. Snow intended to apply for transfer of his Public Service Commission Certificate.[3] In this letter, Deputy Director Cooper indicated that rate increase applications are usually dismissed if a certificate transfer application is made and that, therefore, Mr. Snow may move to dismiss his application for rate increases, case number 04-2003-MC-19A, without prejudice. Deputy Director Cooper requested that Mr. Scotchel inform the Commission whether Mr. Snow wished to have the case dismissed without prejudice.

---

[3] As noted previously, in response to Mr. Snow's later complaint to the Office of Disciplinary Counsel, Mr. Scotchel asserted that he performed work on a sales package for Mr. Snow's sanitation business from October 2005 to October 2006 for a charged fee of $25,000. No sale resulted from this work.

10

Two days later, on September 29, 2005, Mr. Scotchel filed a facsimile with the Commission requesting the withdrawal of Mr. Snow's application for rate increases, case number 04-2003-MC-19A, due to Mr. Snow being in the process of selling his business and seeking to transfer his certificate to the purchaser. Mr. Scotchel indicated that if Mr. Snow was unable to sell his business, he would re-file the application for rate increases. Therefore, Mr. Scotchel advised that he would appear at the October 4, 2005, hearing. On September 30, 2005, Deputy Director Cooper filed a letter requesting that the case be dismissed. On October 26, 2005, the PSC entered an order that granted Mr. Snow's motion to withdraw his application for rate increases, thereby dismissing case number 04-2003-MC-19A and removing it from the Commission's docket. For the work he performed in this matter, Mr. Scotchel later claimed, in response to Mr. Snow's complaint to the Office of Disciplinary Counsel, that he actually began representation of Mr. Snow in November of 2004 (contrary to the June 27, 2005, notice of appearance filed with the PSC), and that his flat fee for work on PSC case number 04-2003-MC-19A was $50,000, which he reduced to $35,000.[4]

### 2. Case No. 06-1714-MC-M

On December 21, 2006, Mr. Snow's certificate for Snow's Sanitation Service was conditionally revoked by the West Virginia PSC under Case No. 06-1714-

---

[4] Mr. Scotchel's verified response also states that this total fee included representation for "Walls violations of Mr. Snow's territory," wherein Mr. Scotchel charged a flat fee of $2,500 reduced to $1,500.

11

MC-M due to the failure of Mr. Snow to pay the required annual assessment and to properly register vehicles with the PSC. The Order also stated that the PSC would issue an Order finally revoking the certificate unless Mr. Snow filed a letter requesting a hearing in the matter by January 3, 2007. On January 2, 2007, Mr. Snow personally filed a letter regarding his efforts to comply with the requests. On January 8, 2007, a staff attorney for the PSC filed a memorandum wherein it stated that Mr. Snow had filed the proof of insurance and recommended the suspension be lifted. On January 9, 2007, the suspension was lifted and Case No. 06-1714-MC-M was dismissed and removed from the PSC's docket. There is no indication that Mr. Scotchel performed any work in this matter.

### *Workers' Compensation Default*

On or about June 27, 2007, Mr. Snow received a letter from the Office of the Insurance Commissioner regarding a default on his workers' compensation obligations. This was due to an October 2, 2006, report from the West Virginia Division of Labor which advised that Mr. Snow had four employees but did not have workers' compensation coverage. Mr. Snow did not have coverage for the four workers because he allegedly believed them to be contractors for whom he did not need coverage. Mr. Scotchel's only involvement in this matter was a single phone call and the transmission of a facsimile. Although Mr. Scotchel would later claim that Mr. Snow faced criminal proceedings; a loss of his business and possible jail time; Gregory Hughes, an employee of the Insurance Commission, testified during the disciplinary proceedings below that

12

Mr. Snow's workers' compensation problems were not that serious and that it would be rare for anyone to lose their business or go to jail. More importantly, the record reflects that the matter was ultimately resolved by Deborah Robinson, Mr. Snow's companion, not Mr. Scotchel. For his claimed representation of Mr. Snow related to this default, Mr. Scotchel charged a flat fee of $10,000.

### *Distribution of the Proceeds of the Sale of Snow Sanitation*

On or about February 21, 2008, Mr. Snow sent Mr. Scotchel a written document regarding payments he wished to have made from the proceeds of the sale of the sanitation service. Mr. Snow stated,

> [f]rom the money I receive from the sale of Snow Sanitation Certificate that's in my name, please pay the following. 1.) Charity L. Snow - $ 50,000.00 2.) All Centra Bank loans 3.) To John Scotchel for all attorney fees, costs, and expenses from year 2002 to the present which includes the closing of the sale of my business in the amount of $25,000.00. Lewis Snow.

At some point, Mr. Scotchel added additional writing to the February 21, 2008, document stating "Does not include fees over $100,000" and additional writing regarding the $25,000 toward the sale of the business that stated "appeal to bus only." Further writing on the bottom of the document stated "S/Client 2/26." During the disciplinary proceedings, Mr. Scotchel did not provide the original February 21, 2008, document, claiming it was lost. There is no indication in the record that Mr. Snow ever saw or agreed to these notations.

13

Thereafter, on June 12, 2008, Mr. Scotchel allegedly had Mr. Snow sign an agreement that stated "I authorize addition [sic] payment of $145,000.00 to John C. Scotchel, Jr. for atty's fees from 2002 to Present." This document purports to contain the signatures of Mr. Snow and Ms. Robinson. As with the February 21, 2008, document, Mr. Scotchel claims that the original of this document has been lost. By the time a copy of this document was produced in the disciplinary proceedings below, Mr. Snow was no longer competent to testify regarding his signature. Ms. Robinson denied that she signed this agreement.[5]

In the months following June 2008, Mr. Scotchel distributed money from the proceeds of the sale of Snow Sanitation Services as requested to Mr. Snow's estranged wife and his daughters, and to banks/finance companies for loans which had been made to Mr. Snow. Mr. Scotchel asserts that he also made advances to Mr. Snow.

According to his later testimony, in December 2008, Mr. Scotchel destroyed records and time sheets related to his representation of Mr. Snow, including legal pads containing his specific detailed notes of the time, work and attorney's fee

---

[5] Mr. Scotchel contends that the HPS improperly allowed Allan N. Karlin, Esquire, and Ms. Robinson to testify regarding the authenticity of the signatures on the June 12, 2008, document. Furthermore, he contends that Ms. Robinson proffered conflicting testimony regarding whether Mr. Snow signed the document and whether she witnessed his alleged signature.

charges for each matter in which he claims he represented Mr. Snow. He contends that he did this because such records could have exposed Mr. Snow to liabilities and that he did so in accordance with Mr. Snow's consent. Mr. Scotchel asserts that the only documents not intentionally destroyed were the summaries identified during the HPS hearing, including the telephone contact summary he provided for the period from February 21, 2008, to May 11, 2008, and the summary of fees he allegedly created in December 2008.

On March 21, 2009, Mr. Snow met with Mr. Scotchel at a McDonald's in the Morgantown area. Mr. Snow requested the rest of his money from the sale of his business and a receipt for Mr. Scotchel's fees in the matter. At this meeting, Mr. Scotchel informed Mr. Snow that there was no money left from the sales proceeds of Snow Sanitation Services. Mr. Scotchel never provided an accounting to Mr. Snow and never provided any additional monies to him.

### *Lawyer Disciplinary Board Proceedings*

Mr. Snow filed a complaint with the Board against Mr. Scotchel on April 6, 2009. In his complaint, Mr. Snow indicated that he wanted a receipt from Mr. Scotchel regarding Mr. Scotchel's attorney's fees and wanted to know where his money was being kept. The signature of Lewis Snow, Sr., appears on the second page of the complaint. The signature of notary Jeanne R. Russell appears below the Lewis Snow, Sr., signature and

shows the date of April 3, 2009. This notary signature is also in blue ink and includes the notarial seal. A copy of this complaint was forwarded to Mr. Scotchel on April 9, 2009.

On May 8, 2009, Allan Karlin sent a letter to Disciplinary Counsel indicating that he had been retained to represent Mr. Snow[6] and that he "understand[s] Mr. Snow has a complaint filed with the Board against John Scotchel." Mr. Karlin stated that his role was "to obtain monies owed to Mr. Snow from Mr. Scotchel." Mr. Karlin further indicated that the Complaint was "prepared by [Snow's] long-time friend Deborah Robinson," as she "has helped him greatly in his business transactions in recent years."

On May 29, 2009, Mr. Scotchel filed his verified response to the Lawyer Disciplinary Board complaint filed against him by Lewis Snow.[7] Below is an abbreviated summary of Mr. Scotchel's break down for his attorney's fees:

---

[6] Mr. Karlin filed a civil action on behalf of Mr. Snow against Mr. Scotchel in the Circuit Court of Monongalia County, West Virginia, on July 23, 2009, for matters arising from the facts herein. The civil case was settled for $225,000 in favor of Mr. Snow. Mr. Snow was required to pay Mr. Scotchel $10,000 to cover his counterclaims against Mr. Snow. Mr. Karlin later testified that of the remaining money left after paying some loans and related costs, half went to Mr. Snow and half went to Mr. Snow's wife.

[7] In his first response to Disciplinary Counsel on May 1, 2009, Mr. Scotchel questioned the authenticity of the ethics complaint as "it is obviously written in third person and the signature is questionable." In his January 7, 2010, sworn statement before Disciplinary Counsel, Mr. Scotchel agreed that Mr. Snow had acknowledged making the complaint in this matter, that Mr. Snow had consented to its filing and that there was no longer a need to question the authenticity of the complaint.

A. October of 2002 until January of 2003, Mr. Scotchel "began work on sales package-Flat fee $25.000- No charge."

B. January 2003 until December 1, 2003, Mr. Scotchel "began work on 3 criminal cases filed against Mr. Snow and his related sanitation business. Case numbers 03M-225, 226, 318." Result – plea entered $620.00 fine which included court costs – 15 days jail suspended – no jail time. Respondent stated "Flat fee charged $40,000 reduced to $25,000."

C. November of 2004 until October 26, 2005, Mr. Scotchel worked on Mr. Snow's case before the West Virginia Public Service Commission, PSC Case 04-2003-MC-19A. Mr. Scotchel stated Mr. Snow's attempt to increase rates lead to various violations filed by the PSC in Case No. 04-2003-MC-19A. Snow Sanitation withdraws Rule 19A application to increase rates and charges dismissed without prejudice. Mr. Scotchel stated "Final Ordered [sic] entered October 26, 2005-no fines or jail time- no loss of license-$50,000 reduced to $35,000."

D. October 2005-October 2006, Mr. Scotchel stated he began "preparation of comprehensive package to sell business utilizing income tax returns, receipts, territory, customers, value of equipment." Mr. Scotchel stated "Flat Fee $25,000 no sale after preparation- Extensive reviewing, discussing and explaining potential multiple violations regarding IRS and WV State Tax Dept for a number of years." "Flat Fee $25,000."

E. June of 2006 until October of 2006, Mr. Scotchel stated "Walls violations of Mr. Snow's territory-Flat fee $2,500 reduced to $1,500." Mr. Scotchel referenced Public Service Commission case 04-2003-MC-19A.

F. October 2, 2006 until May 8, 2007, Mr. Scotchel stated he worked on "06M-3447-4 criminal charges." Result – plea no jail time-$265 fine to be paid in 180 days. Mr. Scotchel stated "Flat Fee $40,000 reduced to $25,000."

G. July 11, 2007 until August 21, 2007, Mr. Scotchel stated he worked on "WV Ins Commission - Workers Comp issues-felony issues" which resulted in no jail time. Mr. Scotchel

stated "Flat Fee $10,000 This required immediate resolution in order for Mr. Snow to stay in business and out of jail."

H. "Summary of above Flat Fee to Reduced Fee

> 1. $ 25,000-$0.00
> 2. $40,000-$25,000
> 3. $50,000-$35,000
> 4. $50,000-$50,000 - sale and transfer of business-Plus potential civil and criminal tax liability issues
> 5. $2,500-$1,500
> 6. $40,000-$25,000
> 7. $10,000-$10,000 not reduced

> Total $217,500 reduced to $146,500

This above was rounded down to $145,000 as agreed to by Mr. Snow as reflected on June 12, 2008, agreement.

I. November of 2007 until June 12, 2008, Mr. Scotchel worked on the "sale and transfer of Mr. Snow's sanitation business $25,000 as agreed to by Mr. Snow on February 21, 2008."

J. June 12 of 2008 until June 19, 2008, Mr. Scotchel prepared an "amended separation agreement-$5,000 flat fee not paid-money disbursed to Mrs. Snow and signed by Mr. Snow."

K. June 20, 2008 until August 8, 2008, Mr. Scotchel prepared agreements to disburse money to Mr. Snow's four children. Mr. Scotchel stated "$5,000-not paid."

L. June 18, 2008 until December of 2008, Mr. Scotchel stated that he worked on "issue with son not signing agreement dragged on. This agreement was different than the one prepared for Mr. Snow's daughters as it involved the return of real estate to Mr. Snow. Mr. Snow's son would not agree even when Mr. Snow said he would pay $10,000 of which Mr. Snow did not have left to give based upon our fee agreements.

18

Regarding disbursements from the $275,000 of business sale proceeds, Mr. Scotchel later testified that, pursuant to earlier directions he claims Mr. Snow gave him, and an order of divorce, he paid $25,000 to Mr. Snow's ex-wife and $10,000 each to Mr. Snow's daughters. After Mr. Snow's son refused the payment from Mr. Scotchel, Mr. Snow took the $10,000 to personally disburse the sum to him. Mr. Scotchel also stated that he disbursed a total of $170,000 to himself for attorney's fees which he claims Mr. Snow agreed to pay him. This sum included a fee of $25,000 for sale of Snow Sanitation Services, which is not disputed, and flat fees of $145,000, which are disputed, for work Mr. Scotchel claims he performed and which Mr. Snow authorized.

On July 28, 2009, following the filing of Mr. Scotchel's May 29, 2009, response, Mr. Karlin filed a letter with the Office of Disciplinary Counsel on behalf of Mr. Snow indicating that "Mr. Snow expressly denies that he ever agreed to or approved of a fee of $145,000.00." On October 13, 2009, Disciplinary Counsel received a letter dated August 9, 2009, from Mr. Scotchel as a reply to Mr. Karlin's July 28, 2009, letter. Mr. Scotchel provided Disciplinary Counsel with a copy of the complaint against Mr. Scotchel filed by Mr. Karlin on behalf of Mr. Snow on July 23, 2009, in the Circuit Court of Monongalia County, West Virginia.[8]

---

[8] *See* note 6, *supra*.

On January 7, 2010, Mr. Scotchel appeared for a sworn statement before Disciplinary Counsel. During that statement, Mr. Scotchel claimed that he had kept time records on the work that he performed for Mr. Snow, but that he had shredded the documents around December of 2008, about four months before Mr. Snow filed his ethics complaint herein.[9] Mr. Scotchel stated he did not have written fee agreements on these matters, except for copies of the February 21, 2008, written agreement and the June 12, 2008, written agreement regarding attorney fees – the originals having apparently been lost.  During his sworn statement, Mr. Scotchel was asked by Disciplinary Counsel for an itemization of the specific work he performed for Mr. Snow since 2002.

Following up on her request made during Mr. Scotchel's sworn statement, on January 13, 2010, Disciplinary Counsel sent a letter to Mr. Scotchel formally directing him to provide "time receipts/bills/invoices of your work in the Snow matter from October 2002 until March 2009."  No such itemized time receipts, bills or invoices of his work in the Snow matters were ever produced by Mr. Scotchel.  He only provided some handwritten documents which merely indicated the case, the total amount of hours, and the amount of fee charged for the matter.

_____

[9] Mr. Scotchel contends that in accordance with consent granted to him by Mr. Snow, he destroyed his files and shredded his legal pads containing his specific detailed notes of the time, work and attorney fee charges for each matter.  Mr. Scotchel asserts that the only documents not intentionally destroyed were the summaries identified during the HPS hearing, including the telephone contact summary he provided for the period from February 21, 2008, to May 11, 2008, and the summary of fees he allegedly created in December, 2008.

On April 27, 2011, the Board issued a Statement of Charges against Mr. Scotchel. He was served with the Statement of Charges on May 3, 2011. Following the granting of an extension until July 26, 2011, Mr. Scotchel timely filed his Answer to the Statement of Charges on July 26, 2011. Following discovery, a hearing was held on February 26 and 27, 2013, and July 15, 2013. The HPS heard testimony from Lewis Snow, Sr., Deborah Robinson, Phillip M. Magro, Roger Cutright, Mary Beth Renner, Ami Schon, Dimas Reyes, Brian Knight, Eugene Sellaro, Deborah Yost Vandervort, Allan N. Karlin, Daniel C. Cooper, John A. Smith, Vickie Willard, Robert H. Davis, Jr., and Mr. Scotchel. Numerous exhibits were admitted into evidence.

On April 16, 2014, the HPS found that the evidence established that Mr. Scotchel violated Rules 1.5(a), 1.5(b), 1.5(c), 1.15(b), 8.1(b), 8.4(c) and 8.4(d) of the Rules of Professional Conduct. Specifically, the HPS found that Mr. Scotchel charged an unreasonable fee to Mr. Snow in the various matters, failed to communicate to Mr. Snow the basis or rate of Mr. Scotchel's fee in the various matters, and failed to have the $25,000 contingent fee agreement on the sale of Mr. Snow's business in writing in violation of Rules 1.5(a), 1.5(b), 1.5(c),[10] 8.4(c) and 8.4(d)[11] of the West Virginia Rules

---

[10] Rule 1.5 of the West Virginia Rules of Professional Conduct provides, in pertinent part:

(continued . . .)

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and skill requisite to perform the legal service properly;

> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

> (3) the fee customarily charged in the locality for similar legal services;

> (4) the amount involved and results obtained;

> (5) the time limitations imposed by the client or by the circumstances;

> (6) the nature and length of the professional relationship with the client;

> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

> (8) whether the fee is fixed or contingent.

(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

(c) . . . A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. . . .

of Professional Conduct. The HPS found that Mr. Scotchel's fee of $170,000 was unreasonable based upon the proof of work provided by Mr. Scotchel. The HPS also found that Mr. Scotchel failed to provide Mr. Snow the funds from the sale of his business and failed to provide a full accounting of the money from the sale of Mr. Snow's business in violation of 1.15(b) of the Rules of Professional Conduct.[12] Additionally, although Mr. Scotchel was directed to re-create the time he spent working on Mr. Snow's matters and the fees he incurred, Mr. Scotchel failed to provide a detailed accounting in

[11] Rule 8.4 of the West Virginia Rules of Professional Conduct provides, in pertinent part:

> It is professional misconduct for a lawyer to:
>
> . . .
>
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
>
> (d) engage in conduct that is prejudicial to the administration of justice;

[12] Rule 1.15 of the West Virginia Rules of Professional Conduct provides, in pertinent part:

> (b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

23

violation of Rule 8.1(b) of the Rules of Professional Conduct.[13]   The HPS issued the

following recommendation as the appropriate sanction:

> A.     That [Mr. Scotchel]'s law license be annulled;
>
> B.     That upon reinstatement, [Mr. Scotchel]'s practice shall be supervised for a period of two (2) years by an attorney agreed upon between the Office of Disciplinary Counsel and [Mr. Scotchel];
>
> C.     That [Mr. Scotchel] shall complete twelve (12) hours of CLE in ethics in addition to such ethics hours he is otherwise required to complete to maintain his active license to practice, said additional twelve (12) hours to be completed before he is reinstated; and
>
> D.     That [Mr. Scotchel] be ordered to pay the costs of these proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

---

[13] Rule 8.1(b) of the West Virginia Rules of Professional Conduct provides, in pertinent part:

> An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
>
> . . .
>
> (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.

24

## II. STANDARD OF REVIEW

In syllabus point 1 of *Lawyer Disciplinary Board v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995), this Court stated that

> Rule 3.7 of the Rules of Lawyer Disciplinary Procedure, effective July 1, 1994, requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence. Prior cases which required that ethics charges be proved by full, preponderating and clear evidence are hereby clarified.

With respect to the applicable standard of review, this Court has held that

> A *de novo* standard applies to a review of the adjudicatory record made before the Committee on Legal Ethics of the West Virginia State Bar as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the Committee's recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the Committee's findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. Pt. 3, *Committee on Legal Ethics of the West Virginia State Bar v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

Before the Supreme Court, "'[t]he burden is on the attorney at law to show that the factual findings are not supported by reliable, probative, and substantial evidence on the whole adjudicatory record made before the Board." *Lawyer Disciplinary Board v. Cunningham*, 195 W. Va. 27, 34-35, 464 S.E.2d 181, 188-89 (1995) (quoting *McCorkle*, 192 W. Va. 286, 290, 452 S.E.2d 377, 381). "This Court is the final arbiter of legal

25

ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt 3, *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984).

## III.    ANALYSIS

We first address Mr. Scotchel's contention that his procedural due process rights have been violated because the ethics complaint filed against him was not signed and verified by Mr. Snow, and because he has been denied the right to meaningfully cross-examine Mr. Snow on relevant matters due to Mr. Snow's incompetency. We find no merit to these assertions.

Following his receipt of the complaint, in his first written response dated May 1, 2009, Mr. Scotchel initially raised the issue of whether Mr. Snow drafted and signed the complaint.  Currently, Mr. Scotchel asserts that Mr. Snow's acquaintance, Ms. Robinson, prepared and signed the complaint, and that Mr. Snow's failure to actually sign and verify the Complaint has had a cascading effect on his defense of these charges.

With regard to Mr. Snow's incompetency, Mr. Scotchel contends that he has been unable to properly defend himself without the testimony of a competent Mr. Snow, since so much of his defense relies on supposed verbal communications and agreements between himself and Mr. Snow.  He alleges that the complaint essentially constitutes allegations asserted by Ms. Robinson, not Mr. Snow; that Mr. Karlin made

26

allegations harmful to him which were hearsay in nature and which should not have been considered; and that the testimony of Ms. Robinson and Mr. Karlin should be ignored since neither individual was present during the attorney-client contacts between himself and Mr. Snow. He contends that if competent, Mr. Snow would give testimony that would exonerate him. Because of these problems with the Disciplinary Counsel's case, Mr. Scotchel claims that the HPS should have granted his motion to dismiss.

Conversely, the Office of Disciplinary Counsel ("ODC") contends that nothing related to Mr. Snow's signature and verification on the complaint or the current incompetency of Mr. Snow violates Mr. Scotchel's due process rights. The ODC observes that while Mr. Scotchel offered the testimony of a forensic document examiner, the examiner never actually examined the original complaint because Mr. Scotchel did not provide it to her. Consequently, the ODC argues that the HPS gave the forensic document examiner's testimony the weight it deserved. Furthermore, due to Mr. Snow's deteriorating condition, Mr. Scotchel's counsel took the deposition of the notary public who signed the notary acknowledgement of Mr. Snow's signature on the complaint. Upon reviewing her records, the notary public who verified the execution of the complaint, testified that she personally witnessed Mr. Snow sign and verify the complaint. There were no challenges to the notary public's veracity and nothing in the record indicates that the notary public had any vested interest in the outcome of the case below or any bias for or against any party. The HPS had the opportunity to view and weigh the testimony of each witness on the signature issue. In view of the strength of the

notary public's testimony and the remaining evidence before the HPS on this issue, we cannot say that the HPS was clearly wrong in denying Mr. Scotchel's motion to dismiss on the signature issue.

We likewise find unavailing Mr. Scotchel's assertion that his due process rights were violated because he was unable to defend himself due to Mr. Snow being unable to testify and "explain" their supposed billing agreements. The central basis for the ethical charges herein is the reasonableness of fees Mr. Scotchel deducted and retained for himself from the proceeds of the sale of Snow Sanitation Services. It was Mr. Scotchel's responsibility to maintain and keep documents relevant to his claimed representations of Mr. Snow, including billing agreements with Mr. Snow and time records related to work performed. It was Mr. Scotchel's own admitted destruction of such documents and time records in December 2008, shortly before the filing of Mr. Snow's ethics complaint, combined with Mr. Scotchel's "loss" of original documents thereafter – documents and time records which he was obligated to retain - that inhibited Mr. Scotchel's ability to defend his conduct, not the lack of testimony from a competent Mr. Snow. Having himself destroyed or "lost" the objective evidence which could exonerate or explain his conduct herein, evidence he was obligated to keep, Mr. Scotchel would have us shift our attention away from his conduct and to engage in speculation that, despite the overwhelming documentary and testimonial evidence against him, all

would be understood if only he could now proffer the testimony of Mr. Snow. We find no merit in Mr. Scotchel's due process argument.[14]

Mr. Scotchel next argues that the HPS's findings and conclusions that he violated the Rules of Professional Conduct are clearly wrong, and, to the contrary, his work and fees were not unreasonable and were by agreement with Mr. Snow. In the alternative, Mr. Scotchel argues that should this Court uphold the HPS's findings and conclusions, the sanctions recommended against him be reduced.

Mr. Scotchel contends that Mr. Snow personally signed a document dated June 12, 2008, wherein he authorized additional attorney's fees in the amount of $145,000 for the work done by Mr. Scotchel on behalf of Mr. Snow in various legal proceedings from 2002 to 2008. This amount was in addition to a fee of $25,000 charged for the sale of Snow Sanitation Services. Mr. Scotchel contends that the HPS erred in allowing Ms. Robinson's and Mr. Karlin's hearsay testimony regarding the authenticity of the signatures on the June 12, 2008, agreement, and that the HPS ignored the fact that

---

[14] Mr. Snow was entitled to receive the proceeds of the sale of his business. To the extent Mr. Scotchel made deductions from those proceeds, it was his burden to justify such deductions with documents, agreements, business records and the like. Having destroyed or lost all such relevant documents, Mr. Scotchel now asserts that HPS was obligated to dismiss the charges against him because Mr. Snow is no longer competent to testify. This is a defense of convenience. We decline to shift our focus away from Mr. Scotchel's duties and actions and to instead focus this case on conjecture and supposition about what Mr. Snow might or might not say if he were competent.

Ms. Robinson had conflicting testimony regarding whether Mr. Snow signed, and whether she witnessed, the June 12, 2008, fee agreement. According to Mr. Scotchel, Ms. Robinson first testified during her deposition that she and Mr. Snow signed the June 12, 2008, fee agreement, but later testified at the HPS hearing that they did not sign the document.

Mr. Scotchel further asserts that even if he acted improperly, he did not act with an intentional and knowing state of mind. Rather, he contends, any violations resulted from mistakes and/or negligence on Mr. Scotchel's part. In addition, Mr. Scotchel notes that Mr. Snow has been made whole as a result of the settlement in his civil action against Mr. Scotchel and that several mitigating factors exists in this case: (1) Mr. Scotchel's cooperative attitude toward the ODC and the disciplinary process; (2) Mr. Scotchel's lack of a prior disciplinary record; (3) Mr. Scotchel's lack of a selfish or dishonest motive; (4) Mr. Scotchel's good reputation as an attorney; and (5) the fact Mr. Scotchel had professional malpractice insurance to pay Mr. Snow his damages resulting from Mr. Scotchel's alleged negligence. Therefore, should this Court affirm the HPS, Mr. Scotchel argues that his license to practice law should not be annulled and that some lesser sanction should be imposed.

Upon review of the record before us, we cannot find the HPS erred in its findings and conclusions that Mr. Scotchel violated the Rules of Professional Conduct. The original version of the June 12, 2008, agreement at issue is no longer in existence

because Mr. Scotchel allegedly lost it during the discovery process in the civil case filed against him by Mr. Snow. The HPS was aware of the discrepancies in Ms. Robinson's prior deposition testimony regarding Mr. Snow's signature on the June 12, 2008, agreement. The HPS heard testimony from Ms. Robinson during the hearing, weighed her credibility accordingly, and based on the evidence placed into the record as a whole, made a proper determination that Mr. Scotchel violated the Rules of Professional Conduct as alleged in the Statement of Charges. The HPS also heard Ms. Robinson's testimony disputing that the signature on the June 12, 2008, document was her signature. It was Mr. Scotchel's burden to establish that his client had agreed to his representation and to the fees that would be charged and to prove he earned such fees in the matters he handled for Mr. Snow. He was singularly unable do that with any of the evidence produced in this case.[15]

After noting that the attorney's fees charged by Mr. Scotchel appeared to be excessively high, Mr. Scotchel was asked by Disciplinary Counsel to re-create his billing for the various matters he purportedly acted on for Mr. Snow's behalf. He failed, however, to provide any itemization or accounting of the work he performed in these matters. Mr. Scotchel provided no proof beyond a handwritten document showing the total amount of fees for each case without any reference to the specific work done.

---

[15] We again note the destruction and loss of relevant documents, including time sheets, by Mr. Scotchel herein. *See* note 9, *supra*.

This Court has stated that,

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

Syl. Pt. 4, *Office of Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998). A review of the extensive record in this matter indicates that Mr. Scotchel has transgressed all four factors set forth in *Jordan*.

### 1. Mr. Scotchel violated duties owed to his clients, to the public, to the legal system and to the legal profession.

Mr. Scotchel deposited the $275,000 from the sale of Snow Sanitation into his IOLTA account. While Mr. Scotchel did pay several outstanding loans that Mr. Snow owed and provided money to Mr. Snow's family, the record reflects that Mr. Scotchel kept the majority of the funds in the amount of $160,269.54 for himself. The agreement between Mr. Scotchel and Mr. Snow that Mr. Scotchel was to be paid $25,000 for work related to the sale of the sanitation service was contingent upon the sale of Mr. Snow's sanitation business. However, this contingency fee agreement was never put in writing

32

until February 21, 2008. Based upon the February 21, 2008, document, the HPS concluded that Mr. Snow did agree to pay Mr. Scotchel $25,000 for work he had performed for Mr. Snow. However, the HPS also concluded that Mr. Scotchel's added handwriting on the copy of the February 21, 2008, document relating to additional fees was unilateral, was in furtherance of Mr. Scotchel's attempt to obtain additional monies from Mr. Snow, and was not evidence of an after-the-fact agreement by Mr. Snow to such fees. This conclusion is not clearly wrong.

As for the June 12, 2008, agreement, the original version of this document has also been lost and there is no way to determine whether the writing on the document was contemporaneous with the signatures on the page or whether the agreement was altered by Mr. Scotchel. Furthermore, we observe that Ms. Robinson challenged the authenticity of the signatures of her and Mr. Snow on this document. Nevertheless, it was Mr. Scotchel's burden to prove that he earned his fees in the matters he handled for Mr. Snow and he was unable do that with any of the evidence produced in this case. Mr. Scotchel was asked by Disciplinary Counsel to recreate his billing for the various matters he asserted that he was involved in for Mr. Snow, but Mr. Scotchel failed to provide any itemization or accounting of the work he performed in these matters. Most troubling are the various excuses that Mr. Scotchel provided to the ODC - including that he had a computer virus and a sprinkler problem causing water damage - when explaining his inability to re-create time charges or produce files. Mr. Scotchel's failure to provide information as requested raised issues related to his candor. Further, the ODC was

33

concerned by Mr. Scotchel's awkward behavior during the video deposition with Mr. Karlin.[16] The ODC was also concerned at the state of disarray in which Mr. Scotchel's office appeared to be.

There is no evidentiary proof that Mr. Scotchel provided thousands of dollars of work in any of the other matters as he claimed. The record reflects that the magistrate cases, case numbers 03-M-225, 226, and 318, in which Mr. Scotchel asserted he was involved were handled primarily by another attorney. In fact, one case, 03-M-318, was dismissed prior to any appearance by Mr. Scotchel, and the case disposition sheet for that misdemeanor clearly shows that another attorney handled the matter. The other attorney who handled the matter testified that he did not remember ever speaking with Mr. Scotchel about the cases. Further, the magistrate case in which Mr. Scotchel was involved from the beginning, 06-M-3447, involved only one misdemeanor charge and not four charges as asserted by Mr. Scotchel. The assistant prosecutors who handled that misdemeanor charge testified that they were not aiming for jail time in the case and neither had spent much time on the case. Mr. Scotchel charged Mr. Snow $50,000.00 to handle the misdemeanor cases and is wholly unable to prove that he earned this fee.

---

[16] The ODC notes that the Respondent wore sunglasses during his videotaped deposition in this matter because he was afraid that Mr. Snow or Mr. Karlin would upload the video to the internet and the glasses would "distort facial recognition programs." We also observe the extensive amount of discussion in the record regarding Mr. Scotchel's serious financial issues, including a large tax lien, and Mr. Scotchel's evasive assertions that he was the target of a complex identity theft scheme putting him in great financial distress.

In similar fashion, the record reveals that in Mr. Snow's 2004 PSC case, Mr. Scotchel was not involved until the end of the matter. Further, Mr. Scotchel provided a "conditional" Notice of Appearance, indicating that he did not want to be involved in the matter if the hearing was not continued. The Conditional Notice of Appearance was not filed until June of 2005, approximately six to seven months after Mr. Snow filed to increase his rates and charges. The PSC was recommending a rate increase for Mr. Snow in the matter, but, after his involvement, Mr. Scotchel convinced Mr. Snow to withdraw his petition for a rate increase despite Mr. Snow's operation of his business at a deficit. Although Mr. Scotchel was involved in the 2004 case, he cannot prove that he earned the large fee that he charged in the matter. The 2006 Public Service Commission case shows no involvement of Mr. Scotchel in the matter.

Mr. Scotchel also had limited involvement in Mr. Snow's workers' compensation issue in 2007. Mr. Scotchel's only involvement was a single phone call and a fax. Mr. Scotchel charged Mr. Snow $10,000.00 for his involvement in this case. In explanation of the large fee, Mr. Scotchel asserted that Mr. Snow was facing jail time and the possibility of losing his business because of his failure to have workers' compensation coverage for certain employees. Insurance Commission employee, Gregory Hughes, made it clear that it was a rare thing for such a case to result in jail time or loss of a business. Furthermore, the record reflects that the matter was ultimately resolved by Ms. Robinson, not Mr. Scotchel.

Based upon the foregoing, the HPS properly concluded that there was clear and convincing proof that Mr. Scotchel violated duties owed to his client by charging unreasonable fees, failing to communicate the basis of the fees, failing to have a contingency fee in writing, failing to provide Mr. Snow with his money from the sale of the sanitation business, failing to provide a full accounting as requested by Mr. Snow, and failing to comply with Disciplinary Counsel's request for itemized billings or accountings.

### 2. Mr. Scotchel acted intentionally and knowingly.

The ODC asserts that in representing Mr. Snow, Mr. Scotchel acted intentionally and knowingly and his actions were clearly not the result of simple negligence or mistake. We conclude that Mr. Scotchel intentionally misappropriated Mr. Snow's funds without rightfully earning those funds as attorney's fees. Mr. Snow and Disciplinary Counsel requested Mr. Scotchel to provide an itemized accounting of his hours and fees in the cases on numerous occasions, but Mr. Scotchel failed to provide the same. These acts are in violation of the duties Mr. Scotchel owed to his clients, the public, and the legal profession.

### 3. The amount of real injury is great.

The third factor that must be assessed is the amount of actual or potential injury caused by Mr. Scotchel's misconduct. We conclude that as a direct result of Mr.

36

Scotchel's misconduct, Mr. Snow suffered real and actual injury. The record supports the HPS's conclusion that Mr. Scotchel took Mr. Snow's money for his own use and then, when challenged, attempted to fabricate his involvement in Mr. Snow's other matters to support his misappropriation of Mr. Snow's money. While it is acknowledged that Mr. Snow sued Mr. Scotchel in a civil proceeding and received a monetary settlement, there is no question that Mr. Snow still suffered injury because of Mr. Scotchel's misconduct.

### 4. There are several aggravating factors present.

The existence of aggravating or mitigating factors is the final consideration under Rule 3.16. Elaborating on this rule, this Court has held that "[a]ggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. Pt. 4, *Lawyer Disciplinary Board v. Scott*, 213 W.Va. 209, 579 S.E. 2d 550 (2003). There are several aggravating factors present in this case, including (1) dishonest or selfish motive, (2) refusal to acknowledge wrongful nature of conduct, and (3) substantial experience in the practice of law. Mr. Scotchel converted client funds entrusted to him and attempted to fabricate his involvement in other matters in an attempt to show that he earned the additional fee. He has been a licensed attorney for almost thirty years.

### 5. The existence of any mitigating factors

We must also consider the mitigating factors in this case. "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may

justify a reduction in the degree of discipline to be imposed." Syl. Pt. 2, *Lawyer Disciplinary Board v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003).  In syllabus point 3 of *Scott*, we explained:

> Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

We find the only mitigating factor to be present in this case is the absence of a prior disciplinary record.

### *Sanctions*

"The Disciplinary Rules of the Code of Professional Responsibility state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." Syl. Pt. 3, *Committee on Legal Ethics v. Tatterson*, 173 W.Va. 613, 319 S.E.2d 381 (1984).  Discipline must serve as both instruction on the standards for ethical conduct and as a deterrent against similar misconduct to other attorneys. In syllabus point 3 of *Committee on Legal Ethics v.Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987), this Court stated:

38

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.

Rule 3.15 of the Rules of Lawyer Disciplinary Procedure provides that the following sanctions may be imposed in a disciplinary proceeding: (1) probation; (2) restitution; (3) limitation on the nature or extent of future practice; (4) supervised practice; (5) community service; (6) admonishment; (7) reprimand; (8) suspension; or (9) annulment. The ODC submits that because of Mr. Scotchel's conduct of effectively abandoning his client's interests and his failure to fully cooperate in these proceedings, Mr. Scotchel's law license should be annulled.

> This Court has held that

> [a]lthough Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates the factors to be considered in imposing sanctions after a finding of lawyer misconduct, a decision on discipline is in all cases ultimately one for the West Virginia Supreme Court of Appeals. This Court, like most courts, proceeds from the general rule that, absent compelling extenuating circumstances, misappropriation or conversion by a lawyer of funds entrusted to his/her care warrants disbarment.

Syl. Pt. 5, *Office of Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998); *Lawyer Disciplinary Board v. Kupec* (*Kupec I*), 202 W.Va. 556, 569, 505 S.E.2d 619, 632 (1998), *remanded with directions*, *see Lawyer Disciplinary Board v. Kupec*

(*Kupec II*), 204 W.Va. 643, 515 S.E.2d 600 (1999). "Disbarment of an attorney to practice law is not used solely to punish the attorney but is for the protection of the public and the profession." Syl. pt. 2, *In re Daniel*, 153 W.Va. 839, 173 S.E.2d 153 (1970); Syl. Pt. 6, *Office of Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998). The ABA Model Standards for Imposing Lawyer Sanctions also provide that absent any aggravating or mitigating circumstances, the following sanction is generally appropriate in cases where the lawyer engages in misappropriation of client funds:

> Standard 4.11. Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

Mr. Scotchel's violations in this case are egregious and touch the very essence of the public's perception of the legal profession. While these are Mr. Scotchel's first offenses of the Rules of Professional Conduct giving rise to discipline, this is not a case of simple negligence or neglect. We conclude that Mr. Scotchel misappropriated client funds and thereafter attempted to justify such a misappropriation by fabricating his involvement in other matters in which Mr. Snow was involved. The HPS had the opportunity to observe Mr. Scotchel's testimony and found that much of his testimony lacked credibility. The HPS was also able to hear and observe the testimony of several witnesses which the HPS found to be credible.

In *Kupec I*, 202 W.Va. 556, 505 S.E.2d 619, this Court recognized as follows:

The term misappropriation can have various meanings. In fact, the misuse of another's funds is characterized as misappropriation or conversion. Black's defines misappropriation as "[t]he unauthorized, improper, or unlawful use of funds or other property for purposes other than that for which intended ... including not only stealing but also unauthorized temporary use for [the] lawyer's own purpose, whether or not he derives any gain or benefit from therefrom." *Black's Law Dictionary* (6th ed. 1990). *See In re Wilson*, 81 N.J. 451, 409 A.2d 1153, 1155 n.1 (1979) (defining misappropriation as "any unauthorized use by the lawyer of client's funds entrusted to him including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom'').

*Id. at* 568, 505 S.E.2d at 631. In this case, Mr. Scotchel was unable to present any persuasive evidence to show that he earned the money that he took from Mr. Snow. Mr. Scotchel's misconduct of taking Mr. Snow's money and then fabricating false work in cases is very serious and shows the intentional nature of his misconduct. The destruction and "loss" of relevant documents by Mr. Scotchel supports this conclusion.

This Court has disbarred several lawyers due to misappropriation of client funds. *In Lawyer Disciplinary Board v. Battistelli,* 206 W.Va. 197, 523 S.E.2d 257 (1999), a lawyer was disbarred for, among other misconduct, neglect of client affairs, repeatedly lying to a client about the status of a case, and withholding too much money from a client's settlement and never sending this money to either a provider or refunding it to the client. In *Committee on Legal Ethics v. Lambert*, 189 W. Va. 84, 428 S.E.2d 65 (1993), a lawyer was disbarred for conversion of a client's money to his own personal

41

use, causing a forged instrument to be uttered, failure to pay over money received on behalf of a client, and failure to inform the Disciplinary Committee of a debt to a client during a reinstatement proceeding. In *Committee on Legal Ethics v. Pence*, 161 W. Va. 240, 240 S.E.2d 668 (1977), a lawyer was disbarred for detaining money collected in a professional or fiduciary capacity without bona fide claim, coupled with acts of dishonesty, fraud, deceit or misrepresentation. In *Committee on Legal Ethics v. White*, 176 W. Va. 753, 349 S.E.2d 919 (1986), a lawyer was disbarred for conversion of client trust funds. In *In re Hendricks*, 155 W. Va. 516, 185 S.E.2d 336 (1971), another lawyer was disbarred for detaining client money without a bona fide claim and for acts of fraud and deceit.

In *Lawyer Disciplinary Board, v. Coleman*, 219 W. Va. 790, 639 S.E.2d 882 (2006), this Court stated that "we do not take lightly those disciplinary cases in which a lawyer's misconduct involves the misappropriation of money. In such instances, we have resolutely held that, unless the attorney facing discipline can demonstrate otherwise, disbarment is the only sanction befitting of such grievous misconduct." *Id*. at 797, 639 S.E.2d at 889. In addition, "misappropriation of funds by an attorney involves moral turpitude; it is an act infected with deceit and dishonesty and will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction." *Kupec*, 202 W.Va. at 571, 505 S.E.2d at 634.

42

Furthermore, regarding contingency fees, this Court has previously made it clear that,

> keeping good time records would be the more prudent course. The burden of proof is always upon the attorney to show the reasonableness of the fees charged. The same burden to prove reasonableness remains with the attorney under any fee structure. Attorneys who fail to effectively document their efforts on behalf of a client run the risk of being unable to convince a reviewing court, based on their word alone, of the reasonableness of the fee charged or, in cases where it applies, the full and proper value of fees to be awarded on a quantum merit basis.

*Bass v. Cotelli Rose,* 216 W.Va. 587, 592, 609 S.E.2d 848, 853 (2004). All of the documentary evidence in the record refutes Mr. Scotchel's wholly undocumented assertions regarding the amount of work he put into Mr. Snow's other cases and demonstrates that Mr. Scotchel failed to effectively document his work to show he charged a reasonable fee.

Lawyers owe duties of candor, loyalty, diligence and honesty to their clients, the legal system and to the profession. For the public to have confidence in our disciplinary and legal systems, lawyers who engage in the type of conduct exhibited by Mr. Scotchel must be removed from the practice of law. A license to practice law is a revocable privilege and when such privilege is abused in the manner established herein, the privilege should be revoked.

43

## IV.    CONCLUSION

Based upon the foregoing, this Court upholds the HPS's recommendation that Mr. Scotchel's law license be annulled and that Mr. Scotchel be held responsible for the costs associated with the instant disciplinary proceeding. However, we find that the HPS's remaining recommended sanctions regarding reinstatement are premature.[17]

Law License Annulled and Other Sanctions.

---

[17] In so holding, we choose not to now establish what must be shown or accomplished in the future by Mr. Scotchel should he seek reinstatement. We believe the better course is to allow the Lawyer Disciplinary Board to make such a determination at such time as Mr. Scotchel actually seeks reinstatement.