IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2024 Term

_____

No. 23-82

_____

FILED

**November 14, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LAWYER DISCIPLINARY BOARD,
Petitioner,

v.

ROBERT L. GREER,
Respondent.

_____

Lawyer Disciplinary Proceeding
No. 21-02-430

LAW LICENSE ANNULLED AND COSTS ASSESSED

_____

Submitted: September 4, 2024
Filed: November 14, 2024

Rachael L. Fletcher Cipoletti, Esquire
Chief Lawyer Disciplinary Counsel
Renee N. Frymyer, Esquire
Lawyer Disciplinary Counsel
Charleston, West Virginia
Counsel for Petitioner

J. Michael Benninger, Esquire
Benninger Law PLLC
Timothy R. Linkous, Esquire
Linkous Law, PLLC
Morgantown, West Virginia
Counsel for Respondent

CHIEF JUSTICE ARMSTEAD delivered the Opinion of the Court.

JUSTICE WOOTON, deeming himself disqualified, did not participate in the decision of this case.

JUDGE R. CRAIG TATTERSON, sitting by temporary assignment.

JUSTICE HUTCHISON dissents and reserves the right to file a separate opinion.

JUDGE TATTERSON dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syllabus Point 3, *Committee on Legal Ethics of the West Virginia State Bar v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

2.      "A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to the questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syllabus Point 3, *Committee on Legal Ethics of the West Virginia State Bar v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

3.      "This Court, like most courts, proceeds from the general rule that, absent compelling extenuating circumstances, misappropriation or conversion by a lawyer of funds entrusted to his/her care warrants disbarment." Syllabus Point 5, in part, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

Armstead, Chief Justice:

In this lawyer disciplinary proceeding, the Office of Disciplinary Counsel ("ODC") objected to the report of the Hearing Panel Subcommittee ("HPS") of the Lawyer Disciplinary Board ("LDB"), which recommended to this Court that the law license of Robert L. Greer ("Mr. Greer"), a member of the West Virginia State Bar,[1] be suspended for six months[2] following a nearly two-year period of misappropriation of client funds in Mr. Greer's client trust account ("IOLTA account"). ODC argues that under prevailing law, and in light of the seriousness of Mr. Greer's conduct, the HPS reached the wrong conclusion and that Mr. Greer's law license should be annulled. At oral argument, Mr. Greer urged this Court to adopt the findings of the HPS and suspend him from the practice of law for six months.

---

[1] Mr. Greer has been a member of the West Virginia State Bar since November 1, 1991, having passed the Bar Examination.

[2] The HPS specifically recommended to this Court that Mr. Greer (1) have his law license suspended for six months, (2) attend six hours of Continuing Legal Education in law office management prior to the end of his suspension period, (3) continue to employ a bookkeeper to ensure IOLTA account funds are properly utilized, (4) comply with Rule 3.28 of the Rules of Lawyer Disciplinary Procedure setting forth the duties of a suspended lawyer, and (5) pay the costs of the disciplinary proceedings.

As ODC argues for annulment, it does not ask for the imposition of the CLE requirement or the requirement of a bookkeeper. In his brief, Mr. Greer argued that his actions are worthy of only an admonishment. During oral argument, Mr. Greer abandoned that argument and agreed with the HPS that a six-month suspension is an appropriate sanction.

1

For the reasons set forth below we agree with the ODC and annul Mr. Greer's law license.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On February 27, 2020, Mr. Greer filed a partition suit on behalf of Tammera L. Faris ("Ms. Faris") in the Circuit Court of Harrison County, West Virginia.  The purpose of the partition suit was to force the sale of a property jointly owned in equal one-third shares as tenants in common among Faris and two other people, Lisa D. Nicholson ("Ms. Nicholson"), and the complainant in this proceeding, Christa L. Grega ("Ms. Grega").  At the conclusion of the action, the property in question sold, and the gross sale proceeds in the amount of $178,776.01 were deposited into Mr. Greer's IOLTA account on May 10, 2021.

Checks were then written to Ms. Faris, Ms. Nicholson, and Ms. Grega for their individual shares of the net proceeds of the sale.  On September 23, 2021, a check drawn on Mr. Greer's IOLTA account was issued to Ms. Faris in the amount of $70,887.25.[3]  On that same day, a check was also issued from Mr. Greer's IOLTA account to Ms. Nicholson in the amount of $53,944.38, and a check was written to Ms. Grega from Mr. Greer's IOLTA account in the amount of $53,944.38. On November 12, 2021, Ms.

---

[3] Ms. Faris expended funds for various costs and expenses in maintaining the property prior to sale which resulted in her receiving a larger distribution of the sale proceeds.

Grega attempted to deposit the check written to her, but it was returned to her for insufficient funds. Ms. Grega immediately contacted Mr. Greer's office to report the fact that the check written from the IOLTA account had bounced. Mr. Greer testified that he spoke with Ms. Grega and that he told her he would "make it good." Thereafter, Mr. Greer obtained a bank loan, deposited funds into the IOLTA account, and wrote multiple checks out of that account to Ms. Grega. These checks were dated December 8, 2021, in the amount of $30,000.00 and December 23, 2021, in the amount of $23,944.38. Additionally, on December 23, 2021, Mr. Greer wrote a check to Ms. Grega out of his law firm operating account in the amount of $669.50, ostensibly to cover the insufficient funds fee and interest of 5%.

Ms. Grega filed a complaint with the LDB dated December 10, 2021, alleging that the check she had received from Mr. Greer in the amount of $53,944.38 had been returned to her for insufficient funds. She further alleged that she spoke with Mr. Greer on December 7, 2021, and he stated that "he spent all of my money."[4] Upon receiving Ms. Grega's complaint, the LDB issued letters to Mr. Greer on December 28, 2021, and January 25, 2022, seeking a verified response to the allegations contained in the complaint. On February 1, 2022, Mr. Greer filed a written self-report through his counsel, admitting Ms. Grega's check was returned for insufficient funds, that he had sent checks to Ms. Grega to cover the dishonored check, and had remitted 5% compound interest to

---

[4] Following his phone call with Ms. Grega, Mr. Greer contacted the LDB on that same date making a general self-report of what had transpired.

3

Ms. Grega, fully paying her within "approximately one month" of when Mr. Greer's first check was returned for insufficient funds.

Mr. Greer also noted in his self-report that he had hired a bookkeeper to audit his IOLTA account to ensure it was reconciled and balanced and that there had been no other issues with IOLTA account checks being dishonored. Mr. Greer further stated that he:

> [A]ccepts responsibility for his actions; has taken immediate action to communicate with his client; has informed her of what he had done; and has taken steps available to him to correct his misconduct so that all harm to his client could be ameliorated to the extent possible. Likewise, he attempted to make his own self-report to [disciplinary counsel].

Thereafter, the LDB issued an investigative subpoena duces tecum to JP Morgan Chase Bank for Mr. Greer's bank account records. These records revealed that from January 2020 through November 2021, there were a series of transfers from Mr. Greer's IOLTA account to his operating account, totaling $87,426.66:

| | |
|---|---|
| January 8, 2020 | $ 2,500.00 |
| January 24, 2020 | $ 4,000.00 |
| March 17, 2020 | $ 4,000.00 |
| May 7, 2020 | $17,087.00[5] |

---

[5] Mr. Greer testified that this $17,087.00 was the proceeds of a PPP loan that his office received during the Covid-19 pandemic. He stated his bank routed the funds to the wrong account.

| | |
|---|---|
| August 4, 2020 | $ 1,500.00 |
| August 5, 2020 | $ 1,500.00 |
| August 10, 2020 | $ 500.00 |
| September 4, 2020 | $ 1,000.00 |
| September 8, 2020 | $ 500.00 |
| September 14, 2020 | $ 1,500.00 |
| March 11, 2021 | $ 2,500.00 |
| March 18, 2021 | $ 500.00 |
| March 30, 2021 | $ 1,500.00 |
| April 27, 2021 | $ 500.00 |
| May 26, 2021 | $ 8,000.00 |
| June 8, 2021 | $ 2,000.00 |
| July 7, 2021 | $ 2,639.25 |
| July 26, 2021 | $ 3,700.41 |
| August 30, 2021 | $ 4,000.00 |
| September 9, 2021 | $ 5,000.00 |
| September 15, 2021 | $ 5,000.00 |
| October 15, 2021 | $ 1,500.00 |
| October 19, 2021 | $ 1,500.00 |
| October 21, 2021 | $ 2,500.00 |
| November 5, 2021 | $ 3,500.00 |
| November 17, 2021 | $ 5,000.00 |

November 19, 2021                    $ 4,000.00

Mr. Greer gave a sworn statement to the ODC on December 1, 2022, in which he admitted that he moved money out of his IOLTA account to cover some expenses. He further stated that he had not reconciled the IOLTA account for over a decade and that he kept track in his head as to how much money in the account was his and how much belonged to his clients. He also later testified that the funds transferred from the IOLTA account to his operating account from January 2020 to November 2021 were either for earned funds or to cover operating expenses, but that he lacked any documentation that could distinguish between the two. Finally, he stated that as of June 2022, all of his accounts had been reconciled, that there was only client money in the IOLTA account, and that he kept the bookkeeper on retainer to prevent any issues from recurring.

On February 15, 2023, the LDB issued a statement of charges against Mr. Greer, asserting that he had committed two violations of the Rules of Professional Conduct. First, it found that Mr. Greer had wrongfully commingled, misappropriated, and converted funds belonging to a client or a third party to his own use, in violation of Rules of

Professional Conduct 1.15(a)[6] and 8.4(c) and (d).[7]  Second, the LDB alleged that because

Mr. Greer had transferred money from another account into his IOLTA account for a

purpose other than paying bank service charges, he commingled his personal funds with

client funds, in violation of Rule 1.15(b)[8] of the Rules of Professional Conduct.

The matter then proceeded to a hearing before the HPS.  In its report, the

HPS found Mr. Greer testified that:

> I hadn't reconciled the account, so I didn't – but I – I
> was keeping in my head some running total, I guess, of what I
> thought was client money and what I thought was – was maybe
> money that I had earned.  And so I would move money from
> my client trust account via an elect – an internal transfer to my
> client trust account . . . to my operating account.  And I did that
> when I needed money to – to meet my overhead expenses and
> I thought I was – was owed some money.

He further acknowledged that because he had not reconciled his IOLTA account, that there

was a risk that he was taking client or third-party funds and that he used monies from the

IOLTA account for purposes other than that for which he received them.

---

[6] Rule of Professional Conduct 1.15(a) provides, "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property[.]"

[7] Rules of Professional Conduct 8.4(c) and (d) provide, "[i]t is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice."

[8] Rule of Professional Conduct 1.15(b) states, "[a] lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account, but only in an amount necessary for that purpose."

Based upon the record before it, the HPS determined that Mr. Greer violated the duties owed to a third party, to the public, to the legal system, and to the profession. It found that "[Mr. Greer] mishandled his IOLTA account for many years. Every time [Mr. Greer] converted money from his IOLTA account to his office operating account without performing the proper accounting, he breached his fiduciary duty." Further, the HPS found Mr. Greer acted knowingly in misappropriating client funds. Specifically, the HPS found that:

> [W]hen [Mr. Greer] needed funds to use for his own benefit, he *knowingly* made transfers of money from his IOLTA account into his office operating account without first verifying the accuracy of the transaction. He engaged in this conduct over the course of many years, which ultimately included using the funds of a third party to cover his expenses for a period.

(emphasis added). The HPS also found there were injuries resulting from Mr. Greer's conduct:

> [Mr. Greer's] conduct has brought the legal system and legal profession into disrepute . . . . Indeed, misuse of a[n] IOLTA account is a breach of trust that reflects poorly on the entire legal profession. [Ms. Grega] also experienced direct harm because of [Mr. Greer's] misconduct. Although ultimately made whole after she lodged her complaint with the ODC, [Ms. Grega] was deprived of her funds and was understandably hurt and frustrated with the experience. Even if the instant proceeding may have involved a singular bounced check, there was a much greater potential for harm from [Mr. Greer's] actions.

Finally, in recommending a sanction, the HPS found there to be aggravating and mitigating factors to consider. The HPS found Mr. Greer's substantial experience in the practice of law and pattern of carelessness when dealing with his IOLTA account over

8

the course of multiple years to be aggravating factors. As for mitigating factors, the HPS found Mr. Greer had an absence of a prior disciplinary record, he made timely effort to make restitution, he fully and freely disclosed the misconduct to the ODC, was cooperative during the proceedings, and demonstrated remorse.

As a result, the HPS found that Mr. Greer knowingly misappropriated and converted to his own benefit funds that had been entrusted to him in a professional fiduciary capacity. The HPS further found Mr. Greer had engaged in this conduct for many years:

> [Mr. Greer], an experienced lawyer, *knowingly misappropriated and converted to his own benefit* funds that had been entrusted to him in a professional and fiduciary capacity and inflicted injuries upon [Ms. Grega], the public, and the legal profession. The evidence presented a pattern of misconduct in the handling of his IOLTA account spanning many years. The repeated acts of misappropriation and conversion of funds with the intent to cover his personal operational expenses as contained in the record exhibit a lack of judgment and touches on the very essence of the public's perception of the legal system.

(emphasis added).

The HPS acknowledged that this Court takes a dim view of lawyers who misappropriate client funds, and that annulment is generally the sanction imposed. However, the HPS concluded that "[w]hile it is undisputed that [Mr. Greer's] conduct, absent the degree of his mitigating actions, would rise to the level of annulment, when taken with consideration given to the extent of his personal actions to correct and self-report may call for disciplinary action short of annulment of his law license."

9

Thus, the HPS found that Mr. Greer "wrongfully commingled, misappropriated, and converted funds belonging to his client or a third party to his own use [and thus], he has violated Rule 1.15(a) and Rule 8.4(d) of the Rules of Professional Conduct." Additionally, the HPS found Mr. Greer also "transferred money from another account into his IOLTA account for purpose other than paying bank service charges, thereby comingling his personal funds with client funds," in violation of Rule 1.15(b) of the Rules of Professional Conduct. Despite finding that Mr. Greer knowingly violated the Rules of Professional Conduct, the HPS recommended to this Court that Mr. Greer (1) be suspended from the practice of law for six months, (2) attend six hours of Continuing Legal Education in law office management prior to the end of his suspension period, (3) continue to employ a bookkeeper to ensure IOLTA funds are properly utilized, (4) comply with Rule 3.28 of the Rules of Lawyer Disciplinary Procedure setting forth the duties of a suspended lawyer, and (5) pay the costs of the disciplinary proceedings.

The ODC objected to the recommended sanction, and this matter was set for oral argument pursuant to Rule 4.11 of the Rules of Lawyer Disciplinary Procedure.

## II. STANDARD OF REVIEW

"This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspension or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327

10

S.E.2d 671 (1984). As the final arbiter, "a decision on discipline is in all cases ultimately one for the West Virginia Supreme Court of Appeals." Syl. Pt. 5, in part, *Off. of Law. Disciplinary Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998). Thus

> A *de novo* standard applies to a review of the adjudicatory record made before the [LDB] as to the questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [LDB's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [LDB's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Syl. Pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

Additionally, this Court is required to consider the factors set forth in West Virginia Rule of Lawyer Disciplinary Procedure 3.16 in determining the appropriate sanction:

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

Syl. Pt. 4, *Jordan* (alterations in original). We have further stated what should be considered as aggravating and mitigating factors. "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syl. Pt. 4, *Law. Disciplinary Bd. v. Scott*, 213 W. Va.

11

209, 579 S.E.2d 550 (2003). "Mitigating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Syl. Pt. 2, *Id.*

> Mitigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

Syl. Pt. 3, *Id.*

## III. ANALYSIS

With these standards in mind, and as there appears to be no dispute as to the salient facts that constitute the violations, we examine the sole issue in this appeal: the appropriate sanction for Mr. Greer's admitted misappropriation of client funds. To answer that question, we first examine our prior case law and the Rules of Lawyer Disciplinary Procedure and apply them to the facts of this case. Following such examination, we conclude that annulment is the proper sanction for Mr. Greer's actions.

Our prior case law is clear that annulment is generally the sanction for misappropriation of client funds: "This Court, like most courts, proceeds from the general rule that, absent compelling extenuating circumstances, misappropriation or conversion by

12

a lawyer of funds entrusted to his/her care warrants disbarment."[9]  Syl. Pt. 5, in part, *Jordan*; Syl. Pt. 5, in part, *Law. Disciplinary Bd. v. Battistelli*, 206 W. Va. 197, 523 S.E.2d 257 (1999); *Law. Disciplinary Bd. v. Wheaton*, 216 W. Va. 673, 684, 610 S.E.2d 8, 19 (2004); Syl. Pt. 4, in part, *Law. Disciplinary Bd. v. Coleman*, 219 W. Va 790, 639 S.E.2d 882 (2006); *Law. Disciplinary Bd. v. Calhoun*, 221 W. Va. 571, 578, 655 S.E.2d 787, 794 (2007); Syl. Pt. 4, in part, *Law. Disciplinary Bd. v. Brown*, 223 W. Va. 554, 678 S.E.2d 60 (2009); *Law. Disciplinary Bd. v. Barton*, 225 W. Va. 111, 122, 690 S.E.2d 119, 130 (2010); *Law. Disciplinary Bd. v. Morgan*, 228 W. Va. 114, 122, 717 S.E.2d 898, 906 (2011); Syl. Pt. 5, *In re Reinstatement of DiTrapano*, 233 W. Va. 754, 760 S.E.2d 568 (2014); Syl. Pt. 9, in part, *Law. Disciplinary Bd. v. Scotchel*, 234 W. Va. 627, 768 S.E.2d 730 (2014); *see also Law. Disciplinary Bd. v. Kupec* ("*Kupec I*"), 202 W. Va. 556, 569, 505 S.E.2d 619, 632 (1998) ("Most courts proceed from the general rule that absent compelling extenuating circumstances, misappropriation or conversion by a lawyer of funds entrusted to his/her care warrants disbarment."); Syl. Pt. 5, *Comm. on Legal Ethics v. Pence*, 161 W. Va. 240, 240 S.E.2d 668 (1977) ("Detaining money collected in a professional or fiduciary capacity without bona fide claim coupled with acts of dishonesty, fraud, deceit or misrepresentation justify annulment of an attorney's license to practice law."); *Comm. on Legal Ethics of the W. Va. State Bar v. Lambert*, 189 W. Va. 84, 428 S.E.2d 65 (1993) (per curiam) (annulment is appropriate sanction where two clients' property is converted to lawyer's use); *Comm. on Legal Ethics of W. Va. State Bar v. White*, 176 W. Va. 753, 349 S.E.2d 919 (1986) (per

---

[9] In our case law, the words "annulment" and "disbarment" are used interchangeably.

curiam) (disbarment warranted when lawyer converts client trust funds); *In re Hendricks*, 155 W. Va. 516, 185 S.E.2d 336 (1971) (per curiam) (failing to dispense monies held in trust coupled with fraud and deceit warrant annulment).

As urged by Mr. Greer, this Court has established an exception to this rule stemming from an American Bar Association Model Standard for Imposing Lawyer Sanctions ("ABA standards") which differentiates the appropriate sanction between knowing and negligent misappropriation of client funds. *See Kupec I*, 202 W. Va. at 569, 505 S.E.2d at 632. We have explained this standard as follows:

> The American Bar Association Model Standards for Imposing Lawyer Sanctions (hereinafter "ABA standards") classify misappropriation offenses according to the level of intent and the level of the injury. The ABA standards are consistent with the general rule in finding disbarment appropriate in cases of knowing conversion with injury or potential injury to the owner of entrusted funds. Where there is little or no actual or potential injury to the owner of entrusted funds, and when the lawyer knows or should know he/she is dealing improperly with entrusted funds, the ABA standards suggest suspension. When the lawyer is merely negligent in dealing with entrusted funds, the ABA standards suggest reprimand or admonishment.

*Id*. (footnote omitted). We have also recognized "[t]he ABA Standards for Imposing Lawyer Sanctions define negligence as the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in that situation." *Morgan*, 228 W. Va. at 122, 717 S.E.2d at 906. Indeed, negligence involves the failure to take adequate steps to ensure compliance with an ethical duty. Mr. Greer's actions go far beyond mere

14

negligence. He knowingly utilized funds rightfully belonging to his clients for his own use. His actions do not constitute mere carelessness or negligence.

Yet, we have applied the exception to annulment where an attorney's actions constitute "negligent," rather than "knowing," conduct sparingly. In *Lawyer Disciplinary Board v. Kupec* ("*Kupec II*"), 204 W. Va. 643, 515 S.E.2d 600 (1999), this Court adopted the HPS recommendation that Mr. Kupec should be admonished for misappropriation of client funds, based upon the HPS finding that his actions were mere negligence:

> In this case, the evidence presented to the HPS supports a finding that Mr. Kupec was *negligent* in his handling of his firm's client trust account. The account was established in 1938 by Mr. Kupec's predecessors, long before Mr. Kupec became a member of the bar in 1976. When Mr. Kupec and his partners assumed control of the firm, they assumed control of the account, and appear to have simply operated the account contrary to the strictures of the *Rules of Professional Conduct.* Most client money was placed in the account, and expenses for clients' cases were withdrawn from the account, without regard for the safety of the client's assets.

204 W. Va. at 649, 515 S.E.2d at 606. Thus, in *Kupec II*, this Court adopted the HPS finding that Mr. Kupec was negligent in the handling of client trust funds and levied an admonishment. Likewise, in *Lawyer Disciplinary Board v. Chittum*, 225 W. Va. 83, 689 S.E.2d 811 (2010), this Court again adopted an HPS finding of negligence in handling client trust funds, supporting a sanction of a reprimand:

> Since we must give the Board's findings of fact substantial deference, we cannot say that their finding of negligence was clearly wrong. We note that the [HPS] found that there was no actual injury to any client or to Mrs. Chittum with regard to Mr. Chittum's commingled funds and failure to

15

> maintain a proper IOLTA account. In addition, there was no intent to convert the clients' entrusted funds for his own use. Therefore the recommendation that Mr. Chittum be issued a reprimand, rather than a suspension, is supported by the ABA standards and our prior case law.

225 W. Va. at 92, 689 S.E.2d at 820.

However, the vast majority of cases citing to either *Kupec I* or *Kupec II* have resulted in annulments of law licenses based upon a finding of knowingly misappropriating client funds. *See Wheaton*, 216 W. Va. at 684, 610 S.E.2d at 19 (annulling license to practice law, while citing to *Kupec I*, where the lawyer knowingly converted client funds.); *Battistelli*, 206 W. Va. at 206, 523 S.E.2d at 266 (applying *Kupec I*, annulling Mr. Battistelli's law license, and finding "that the Respondent acted knowingly and intentionally in these violations and that his behavior caused harm to those with whom he dealt[.]"); *Scotchel*, 234 W. Va. at 645, 768 S.E.2d at 748 (citing to *Kupec I* and *Kupec II*, and annulling law license because "this is not a case of simple negligence or neglect."); *Law. Disciplinary Bd. v. Morgan*, 243 W. Va. 627, 644, 849 S.E.2d 627, 644 (2020) (Law license annulled where "[t]he HPS found that Mr. Morgan acted both intentionally and knowingly over the course of committing his violations."); *Law. Disciplinary Bd. v. Morgan*, 228 W. Va. at 123, 717 S.E.2d at 907 (rejecting an HPS finding of attorney negligence under *Kupec I* when Mr. Morgan "charged clients money for work that he never performed" finding such to be knowing. "If Mr. Morgan's actions were truly negligent

16

and not intentional or knowing, the same misconduct would not have been repeated on numerous occasions.").[10]

We now turn to the record in this matter. Upon giving deference to the HPS's findings, we conclude that the HPS correctly found facts that supported its conclusion that Mr. Greer knowingly misappropriated money in his IOLTA account for his own use, thereby violating the duties owed by him to a third party, to the public, to the legal system, and to the profession. Indeed, protecting and ensuring the proper payment of funds belonging to clients is a fundamental and basic ethical duty of all attorneys licensed to practice in West Virginia. The formation and proper operation of an IOLTA account represents a key protection of funds rightfully belonging to clients against comingling and misappropriation. Mr. Greer's habitual, blatant, and knowing misappropriation of his clients' funds rendered serious harm not only to his clients but to the legal profession as a whole. Accordingly, and in light of our prior law and the Rules of Lawyer Disciplinary

---

[10] In fact, our research only revealed one case citing to *Kupec I* or *Kupec II* where this Court levied a sanction less than annulment when a lawyer knowingly misappropriated funds. In *Lawyer Disciplinary Board v. Atkins*, 243 W. Va. 246, 842 S.E.2d 799 (2020), "HPS found, and we agree, that Mr. Atkins acted negligently and knowingly" in misappropriating and commingling funds. 243 W. Va. at 254, 842 S.E.2d at 807. The misappropriated funds at issue in *Atkins* were those of another lawyer, occurred once, and there was no finding of any misappropriation of another client's funds. *Id.*, 243 W. Va. at 250-51, 842 S.E.2d at 803-04. "Mr. Atkins settled [a matter] and failed to remit the settlement funds to [the other lawyer's] office for almost one year despite numerous inquiries about the status of the settlement funds." *Id.* On those facts, this Court found that a nine-month suspension was an appropriate sanction, acknowledging the rule in *Kupec I*. *Atkins*, 243 W. Va. at 259, 842 S.E.2d at 809.

17

Procedure, we now apply the factors contained in Rule 3.16 and Syllabus Point 4 of *Jordan*[11] and adopt the HPS's factual findings.

There is no dispute that Mr. Greer violated his duties to the public, the legal system and the profession by taking money over the course of years from his IOLTA account and appropriating it to his own use to cover his own expenses. His actions cast a pall upon the legal system and profession and undoubtedly caused significant damage to lawyers' reputation with the public. The HPS plainly found that Mr. Greer acted knowingly in this multi-year course of conduct. Giving substantial deference to those findings, we concur with the HPS that Mr. Greer acted knowingly.

As to whether Mr. Greer caused actual or potential injury, Mr. Greer avers that the injury to Ms. Grega was minimal because Mr. Greer acted with alacrity in making good the bounced check. We agree that he did act quickly to rectify the situation but by

---

[11]   Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.

Syl. Pt. 4, *Jordan*.

18

that time, the damage was done. Ms. Grega was forced to endure a period of uncertainty regarding the funds to which she was clearly entitled and faced potential damage to her credit. Further, the potential that Mr. Greer's actions had to injure other clients gives this Court great concern. Over the course of years, Mr. Greer transferred from his IOLTA account to his operating account, a total of $87,426.66. Even if we agree with his contention that the transfer of $17,087.00 was an improperly deposited check from the federal government from a PPP loan for Covid-19 relief, he still took $70,339.66 of money from his IOTLA account, without authorization. In fact, it is important to note that at the time the transfers that were revealed in this case began, no funds in the IOLTA account belonged to Ms. Grega. At that time, the partition suit involving Ms. Grega was in its infancy. She was a defendant in that matter. Thus, the first misappropriated funds *did not belong to Ms. Grega*. They belonged to other clients. Accordingly, Mr. Greer knowingly took funds from multiple clients over the course of years and converted them to his own use. It wasn't until the check to Ms. Grega bounced that his scheme was laid bare. However, the *potential* injury to scores of innocent clients cannot be understated.

Under the Rule 3.16 analysis, we next look at aggravating and mitigating factors. We agree with the findings of the HPS that there were both aggravating and mitigating factors. The aggravating factors present in this matter include the fact that Mr. Greer has been a practicing lawyer for more than thirty years and knew better than to knowingly appropriate monies held in his IOLTA account for his own purposes.

19

As for mitigating factors, the HPS found, and we also agree, that Mr. Greer had no prior disciplinary record; he did quickly attempt to ameliorate the problem by making good on the bounced check;[12] he was cooperative, cordial, and contrite during the course of the proceeding; and he took steps to correct the problem, including hiring a bookkeeper to balance his books and to ensure the situation did not recur.

When weighing all of these factors, we find that disbarment is the appropriate sanction. "Disbarment of an attorney to practice law is not used solely to punish the attorney but is for the protection of the public and the profession." Syl. Pt. 2, *In re Daniel*, 153 W. Va. 839, 173 S.E.2d 153 (1970). In *Coleman*, this Court stated that "we do not take lightly those disciplinary cases in which a lawyer's misconduct involves the misappropriation of money. In such instances, we have resolutely held that, unless the attorney facing discipline can demonstrate otherwise, disbarment is the only sanction befitting of such grievous misconduct." 219 W. Va. at 797, 639 S.E.2d at 889. In addition, "[m]isappropriation of funds by an attorney involves moral turpitude; it is an act infected

---

[12]     Restitution is not a defense to misappropriation. *See In re Staab,* 785 S.W.2d 551 (Mo.1990); *In re Haupt,* 250 Ga. 422, 297 S.E.2d 284 (1982). *See also* Syl. Pt. 4, in part, *Committee on Legal Ethics of West Virginia State Bar v. Hess,* 186 W. Va. 514, 413 S.E.2d 169 (1991) ("The repayment of funds wrongfully held by an attorney does not negate a violation of a disciplinary rule."). However, restitution may be considered as a mitigating factor in the imposition of sanctions.

*Kupec I*, 202 W. Va. at 569-70, 505 S.E.2d at 632-33 (1998).

with deceit and dishonesty and will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction." *Kupec I,* 202 W. Va. at 571, 505 S.E.2d at 634 (citation omitted). We find no such "compelling extenuating circumstances here." Indeed, were we to apply a less severe sanction than annulment under the facts of this case, such action would represent a sharp departure from our prior cases – a departure not warranted in this case.

Mr. Greer knowingly took monies from multiple clients over the course of numerous years, which resulted in actual and potential injury to Ms. Grega as well as potential injury to scores of his clients. Mr. Greer's actions were not mere deviations from the standard of care, resulting in negligence. The HPS found, and we concur, that Mr. Greer's actions were knowing and recurring. Therefore, we find that annulment is the proper sanction in this case.

## IV. CONCLUSION

We reject the recommendation of the HPS and annul Mr. Greer's law license. Mr. Greer must comply with the terms of 3.28 of the Rules of Lawyer Disciplinary Procedure. The costs of this proceeding are to be assessed against Mr. Greer.

Law license annulled. Costs assessed.

21